# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BUCKEYE COMMUNITY HOPE FOUNDATION and BUCKEYE COMMUNITY SIXTY NINE, LP, | |
| Plaintiffs, | Civ. Action No. 1:16-cv-4430 |
| v. | **COMPLAINT** |
| | Jury Trial Demanded |
| VILLAGE OF TINLEY PARK, VILLAGE OF TINLEY PARK BOARD OF TRUSTEES, VILLAGE OF TINLEY PARK PLAN COMMISSION, DAVID G. SEAMAN, MICHAEL J. PANNITTO, JACOB C. VANDENBERG, and BRIAN H. YOUNKER, | |
| Defendants. | |

## INTRODUCTION

1.      This action arises out of the unlawful and discriminatory actions of Defendants Village of Tinley Park, Village of Tinley Park Board of Trustees, Village of Tinley Park Plan Commission, Village of Tinley Park Mayor David G. Seaman, Village of Tinley Park Board of Trustees member Michael Pannitto, Village of Tinley Park Board of Trustees member Jacob C. Vandenberg, and Village of Tinley Park Board of Trustees member Brian H. Younker, which have had the purpose and effect of disallowing, delaying, blocking, and otherwise interfering with the attempt by Plaintiffs Buckeye Community Hope Foundation and its affiliate, Buckeye Community Sixty Nine, LP, (collectively, "Buckeye") to construct a multi-family affordable housing development for low-income individuals and families known as The Reserve at 183rd Street and Oak Park Avenue in the Village of Tinley Park, Illinois.

2.     In early 2015, Buckeye began plans to develop The Reserve, a high-quality, 47-unit affordable housing complex in Tinley Park, Illinois, that would serve the area's low-income households, who are disproportionately African-American and families with children.  When the project became publicized in January 2016, members of the Tinley Park community began a vehement, well-organized campaign to oppose and kill the development.  The opponents have thus far been successful, having persuaded Village officials to delay and obstruct the project indefinitely.  This obstruction has harmed Buckeye's ability to obtain the property for The Reserve and retain the Low-Income Housing Tax Credit funding it has been awarded to develop the project.

3.     The Village of Tinley Park is a predominantly white suburb of Chicago located in the far southwest corner of Cook County, Illinois, with a small part of the Village in neighboring Will County, Illinois.

4.     The Village has a dearth of affordable housing and its lower income citizens are severely rent burdened.  Those rent burdens fall heavily on African Americans and families with children, who are overrepresented among the poor and have the greatest need for affordable housing in the area.  The Reserve, if built, would help alleviate the need for affordable housing and increase the racial integration of Tinley Park.

5.     Buckeye initiated development of The Reserve in early 2015 and undertook a year-long planning process to purchase the land, design the project, obtain necessary financing, and to meet or exceed every requirement of the Village's applicable zoning ordinances.

6.     After the Village's Planning Department found The Reserve to be in "precise compliance" with code, and just days before the Plan Commission was expected to vote to approve the proposal on the Planning Department's recommendation, fierce community

opposition arose. The opposition is explicitly based on discriminatory attitudes toward African Americans, communities with a majority of African Americans and other minorities, and lower income families with children. Tinley Park residents publicly compared The Reserve to the now-demolished, predominantly African-American public housing developments in Chicago, such as the Robert Taylor Homes and Harold Ickes Homes. Opponents have suggested that The Reserve is more appropriate for the predominantly African-American communities in the area such as Robbins, Country Club Hills, Matteson, and Sauk, and that it is not appropriate for Tinley Park or other predominantly white communities like Naperville and Downers Grove.

7. Opponents also suggested that allowing The Reserve to be built would increase crime, lower property values, and allow lower income children to overcrowd the schools in Tinley Park and reduce test scores. In direct and explicit reference to the Village residents' opposition, Village officials acceded to the discrimination, expressing their support for the opponents, revealing their own discriminatory attitudes, and ultimately taking a series of unprecedented and impermissible actions intended to delay and derail the project.

8. The Village has effectively stopped the project by having the Plan Commission refer the project back to the Planning Department, which had completed its review and had found that the project was in "precise compliance" with the Village's zoning code. The Village, however, will not take any further action on Buckeye's application for The Reserve. Meanwhile, Buckeye's option to purchase the parcel for The Reserve is about to expire and Buckeye is at risk of losing the financial benefits of the Low-Income Housing Tax Credits and project-based vouchers awarded to the project.

9. Defendants' actions to oppose The Reserve have unlawfully discriminated against potential residents on the basis of race, national origin, and familial status, in violation of federal

and state fair housing laws, and will have a disparate impact on racial minorities and families with children, in violation of those same laws. Defendants' actions also have the purpose and effect of perpetuating racial segregation in Tinley Park by denying African Americans the opportunity to live in the overwhelmingly white community. Defendants' actions also constitute unlawful interference with Buckeye's right to develop affordable housing based on the protected classifications referenced above.

10.     Buckeye seeks a declaratory judgment, permanent injunctive relief, and damages for Defendants' unlawful behavior. This action is brought under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*, Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.*, the Illinois Human Rights Act, 775 Ill. Comp. Stat. Ann. 5/3-101 *et seq.*, the Illinois Civil Rights Act of 2003, 740 Ill. Comp. Stat. Ann. 23/5, and Illinois common law.

## PARTIES

11.     Plaintiff Buckeye Community Hope Foundation is a 501(c)(3) not-for-profit affordable housing developer. The Foundation was chartered in 1991 with the mission of developing affordable housing for low-income families. The Foundation's principal place of business is in Ohio. The Foundation has extensive experience developing affordable housing in states throughout the Midwest, Appalachia, and the Southeast, including Illinois, Indiana, Kentucky, North Carolina, Pennsylvania, South Carolina, Virginia, and West Virginia. The Foundation has been or currently is the developer of 90 affordable housing projects containing a total of 3,777 units, and has been the general partner in a number of other affordable housing projects. The Foundation has extensive experience developing affordable housing under the federal Low-Income Housing Tax Credit program.

12. Plaintiff Buckeye Community Sixty Nine, LP, is a limited partnership registered with the State of Illinois on July 27, 2015, and is the proposed owner of The Reserve. Buckeye Community Sixty Nine, LP, has an office in Chicago, Illinois. The managing general partner of the limited partnership is Tinley Park Housing Partners, Inc., an Ohio corporation with its principal place of business in Ohio, which is fully controlled by Plaintiff Buckeye Community Hope Foundation. The minority general partner of the limited partnership is DFP Facility Holding, LLC, an Ohio corporation with its principal place of business in Ohio that is registered to do business in Illinois.

13. Defendant Village of Tinley Park is a municipal corporation located in Cook County and Will County, Illinois. The Village is organized under and operates by virtue of the rules of the State of Illinois as a home rule unit of local government. The Village government is comprised of the Mayor, Village Clerk, a six-member Board of Trustees, various subsidiary citizen boards and commissions, the Village Manager, and professional staff. The Village of Tinley Park is the recipient of federal funds from the U.S. Department of Energy and the sub-recipient of federal funds from the U.S. Department of Transportation. As a federal funding recipient, the Village is subject to Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance.

14. Defendant Village of Tinley Park Board of Trustees is comprised of the Mayor and six elected Board of Trustees members.

15. Defendant David G. Seaman is the Mayor and a resident of the Village of Tinley Park. At times relevant to this Complaint, Defendant Seaman was a member of the Tinley Park

Board of Trustees and served as the mayor pro tem before becoming mayor. He is sued in his individual capacity.

16.     Defendant Michael J. Pannitto is a member of the Village of Tinley Park Board of Trustees and a resident of the Village of Tinley Park. He is sued in his individual capacity.

17.     Defendant Jacob C. Vandenberg is a member of the Village of Tinley Park Board of Trustees and a resident of the Village of Tinley Park. Mr. Vandenberg is the Chairman of the Planning and Zoning Committee of the Village of Tinley Park Board of Trustees, and is the Trustee Liaison to the Village of Tinley Park Plan Commission. He is sued in his individual capacity.

18.     Defendant Brian H. Younker is a member of the Village of Tinley Park Board of Trustees and a resident of the Village of Tinley Park. He is sued in his individual capacity.

19.     Defendant Village of Tinley Park Plan Commission is a nine-member commission comprised of volunteer members who are appointed by the mayor. The Plan Commission's responsibilities include preparing and recommending to the Village of Tinley Park Board of Trustees a comprehensive plan for the present and future development of the Village (and contiguous unincorporated territory not more than 1.5 miles beyond the corporate limits of the Village and not included in any other municipality). The Village of Tinley Park 2011 Legacy Code provides the Plan Commission final authority to approve projects that are in precise conformance or moderate conformance with the 2011 Legacy Code.

**JURISDICTION AND VENUE**

20.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343(a)(3), 2201, and 2202, and 42 U.S.C. § 3613(a).

6

21.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the claims arose in the District, Defendants are incorporated in and/or reside in this District, Plaintiffs do business in this District, and a substantial part of the events giving rise to this action occurred in the District.

## FACTS

### Tinley Park's Historical Resistance to Racial Integration

22.     Tinley Park has a long history of resistance to racial integration and affordable housing in the Village.  According to a 1962 article in the *Chicago Defender*, just one African-American household lived in Tinley Park and only one other house in the Village was available for sale "on a nondiscriminatory basis" at that time.  Ernestine Cofield, *Group Pushes Drive to Crack Home Bias*, Chicago Defender, Oct. 10, 1962.

23.     A 1974 *Chicago Tribune* article characterized the Village as, "one of the south Chicago area's staunchest outposts of conservatism" and argued that it was "composed of a runaway white, middle-class population that fled [Chicago's] former South Side city neighborhoods."  Edwin E. Black, *He Knew What To Expect*, Chicago Trib., Feb. 17, 1974. According to the article, Tinley Park residents were opposed to racial integration, public housing, busing of students to desegregate schools, and tax-funded social programs, and were "fiercely committed to not letting crime, crowding, or racial co-mingling happen to them again."  *Id.*

24.     Fair housing testing by the South Suburban Housing Center in the late 1970s found that realtors in Tinley Park engaged in widespread racial steering.  Tests showed that non-Hispanic white testers were provided with significantly more assistance by realtors and shown more homes.  Homes shown to white testers were mostly located in exclusively white areas while the majority of homes shown to African-American testers were outside of white areas.

25.     In 1982 and 1983, residents of Westhaven—a community bordering Tinley Park now known as Orland Hills—fought to oppose a proposed 176-unit affordable housing development.  According to the *Chicago Tribune*, residents opposed the development because it would be home to approximately 500 low-income residents, the vast majority of whom would be racial or ethnic minorities.  Elected officials and 26 homeowners associations in Tinley Park and Orland Park, a predominantly white suburb bordering Westhaven and Tinley Park, organized support for Westhaven residents opposing the development.  Steve Kerch, *More Trouble for Westhaven*, Chicago Trib., Jan. 28, 1983.  The mayor of Tinley Park at the time, Edward Zabrocki, stated that he was opposed to the development in Westhaven because, "we certainly don't want to see an area on our border develop problems because they become our problems too."  *Id.*  Mr. Zabrocki served continuously as the mayor of Tinley Park from 1981 to April 2015, and was the mayor when Buckeye first approached the Village about its proposed development of The Reserve in March 2015.

26.     Later in 1983, the Leadership Council for Metropolitan and Open Communities filed suit against 15 south suburban realty agencies and 41 south suburban realtors charging that they engaged in unlawful racial steering.  Eight of the 15 realty agencies were based in Tinley Park.  In 1984, the U.S. Department of Justice filed its own suit against the realty agencies.

### Tinley Park's Legacy Plan and Legacy Code

27.     In 2009, Tinley Park adopted the Legacy Plan, a comprehensive master plan for the development of the Village's downtown area.  The Legacy Plan was the result of a year-long process involving the Village, community leaders, business leaders, and residents of Tinley Park.  Community engagement included an open public forum and a questionnaire distributed to the community.

28.     The Legacy Plan is based on ten principles related to preservation, economic

development, infrastructure, and urban design.  One of these principles was to "[t]ransition from

commercial uses to residential uses outside the downtown core."  The Plan was intended to

promote "in-fill" development in the downtown area as the Village sought to recover from the

economic recession.

29.     The Legacy Plan called for a "Gateway District" at the southern end of the

downtown area, which included the intersection at 183rd Street and Oak Park Avenue, where

Buckeye has proposed building The Reserve.  The Gateway District is outside the downtown

core area.

30.     On an illustrative map of the Gateway District in the Legacy Plan, the potential

land uses identified for development at the intersection of 183rd Street and Oak Park Avenue

were "Civic/Institutional/Office/Multifamily."  The illustrative plan did not contemplate

"Neighborhood Commercial" or "Mixed Use" as potential uses for the Gateway District or that

intersection, as it did for other districts within the area covered by the Legacy Plan, including the

Downtown Core and North Oak Park Avenue areas.

31.     On July 19, 2011, the Village approved the 2011 Downtown Legacy Code to

implement the 2009 Legacy Plan.  As described in the Code itself, "[t]he Legacy Code

implements the Legacy Plan by codifying Tinley Park's vision with a purposefully specific and

precise form-based approach."  The intent of this form-based code was to streamline approvals

of proposed developments conforming to the code's requirements and to promote development

in downtown Tinley Park.  As stated in the Code, "The intent of this code is to reward those who

strive to meet its standards and regulations.  Therefore, the length of review time and number of

meetings required to obtain project approval shall be based upon the degree of conformance to

9

this code." On October 6, 2015, the Village Board of Trustees approved Ordinance No. 2015-O-045, which contained several text amendments to the Legacy Code.

32. The Legacy Code applies to development in Tinley Park's downtown, defined by the Code as "the area of land along Oak Park Avenue generally between 167th Street and 183rd Street, as depicted on the Code Area Map . . . and as designated on the official Zoning Map of the Village of Tinley Park." The Legacy Code refers to this area as the "Legacy Code Area," which is also referred to as the "Legacy District."

33. The Legacy Code Area contains several distinct "character districts" reflecting different intended land uses. The intersection at 183rd Street and Oak Park Avenue, where The Reserve would be located, was zoned to be in the "Neighborhood Flex" character district, which the Legacy Code indicated was "intended to help create a mixed [sic] of commercial and multi-family uses to anchor the north and south ends of the Legacy Code Area."

34. The Legacy Code describes the specific process by which project developers may seek an approval of a project to be located within the Legacy Code Area.

35. First, the applicant must participate in a pre-application conference with Village planning staff, at which "the applicant shall be prepared to present conceptual plans, sketches or any other information necessary to explain the proposed improvements, including any specific requests to deviate from the standards of this code," and at which "Village staff will provide general information and direction relative to the long-range goals of the Legacy Plan and the Village of Tinley Park, as a whole . . . [and] direction on the applications, reviews, and meetings that will be required to obtain approval."

36. The Legacy Code authorizes the Village's Planning Department staff to determine the approval process for projects requiring site plan review "based upon the relative conformity

to the Legacy Plan and this code, and also based upon whether or not a Special Use, variance(s), and/or rezoning are required."

37.     For projects requiring site plan review by the Village's Planning Department staff, the Legacy Code requires a developer to submit an application, site plan, new plat of survey with legal description, landscape plan, engineering plans with existing and proposed utilities, topographic plan, stormwater plan, photometric and lighting plan, elevation drawings including materials, color renderings, signage plans, and any other items requested by Village staff.

38.     For projects in which the Village's Planning Department determines that the "[s]ite plan matches the development and redevelopment scenarios presented in the Legacy Plan, including use, site plan, massing, and architectural details," and the proposal "requires no variances from the Legacy Code, and needs no special approvals," the project will be deemed to be in "precise conformance" with the Legacy Code.

39.     Following the Planning Department staff's review of the project application and its determination that a project is in precise conformance with the Legacy Code, the Plan Commission can consider the application and the Planning Department's determination regarding the proposed project's conformity with the Legacy Code, and approve the application at one meeting.  In the event the Plan Commission disagrees with the Planning Department's determination that a project is in precise conformance with the Legacy Code, the Commission will hold a work session.  If, at that work session, the Commission determines that the proposal is in moderate conformance with the Legacy Code, such that the site plan matches the spirit and intent of the Legacy Plan but requires no special approvals or variances, the Commission can approve the project at its next meeting.  No public hearing, consideration, or approval by the

Board of Trustees is necessary for a project found by the Planning Department staff to be in precise or moderate conformance with the Legacy Code.

40.     Under the Legacy Code, a developer may only seek building permits following the Plan Commission's approval of the project.

41.     Other residential projects in the Legacy Code Area have recently been approved by the Plan Commission under the form-based approval process contemplated by the 2011 Downtown Legacy Code, without the review, recommendation, or approval by the Board of Trustees and with no community objection.  In 2015, the Plan Commission approved the Union Square Townhomes, a market-rate development at 179th Street and Oak Park Avenue consisting of four multi-family non-rental townhomes with ten two bedroom units and seven three bedroom units.  Similar to the Planning Department's later staff report on The Reserve, the August 20, 2015 Planning Department staff report recommending the Union Square Townhomes project noted that the project fully conformed with the Legacy Code, and that the developer and architect "worked cooperatively" with the Planning Department staff to create an attractive structure meeting Legacy Code requirements.

42.     The Village has also approved other multi-family apartment complexes outside of the Legacy Code Area, even where those approvals required variances or special use permits to move forward.  For example, in 2015, the Plan Commission and the Board of Trustees approved Bickford Senior Living, a 44-unit market-rate senior housing complex set to open later in 2016, after rezoning the site and granting a special use permit for that project.  In 2014, the Plan Commission and Board of Trustees approved Brookside Ridge Rowhouses, a 120-unit market-rate townhouse development, and Anthem Memory Care, a 66-unit assisted living complex for seniors also scheduled to open later in 2016.

43.     Not a single application for a proposed multi-family residential development in the Village brought to the Tinley Park Plan Commission from 2013 to the present has been denied.

### Tinley Park Demographics

44.     Tinley Park has an estimated total population of 57,099 people.  The Village's population is 81.2 percent white and 3.6 percent African American/black.  Tinley Park has a significantly higher percentage of white residents and significantly lower percentage of black residents than Cook County, which is 43.4 percent white and 23.9 percent African American/black.

45.     Tinley Park has a significant need for affordable housing as a large portion of renter households in the Village are rent-burdened.  An estimated 77.5 percent of Tinley Park renter households with an annual income of less than $35,000 paid more than 35 percent of their income toward rent and approximately 59 percent of those paid more than 50 percent of their income toward rent.

46.     A third of moderate income households—those with a household income of between $35,000 and $49,999—pay more than 35 percent of their income toward rent.

47.     Affordable housing in Tinley Park is scant and there are no affordable housing complexes for families with children in the Village.  The only affordable housing complex in the entire Village is limited to senior citizens.  That complex, Brementowne Manner, built in 1980, was developed with and is subsidized by federal affordable housing funds.  Brementowne Manner is age-restricted, providing supportive housing for seniors over the age of 62.  The complex has 106 one bedroom rental units.  Its tenant population is approximately 83 percent white.

13

48.     In recent years, the Village has considered only one other application for an affordable housing development, which faced substantial community opposition.  In 2010, the Ryan Companies proposed a 100-unit affordable senior development called Thomas Place. Thomas Place required a zoning change and several variances because the proposed site was located in a single family residential zone.  The proposed project was outside of the Legacy Code Area and not subject to the streamlined approval requirements of the Legacy Code.  The Village held two public hearings and allowed public comment at a Board of Trustees meeting.  Public response was negative, with community members expressing concerns about decreased property values and the perception that the project would not remain exclusively available to senior citizens in the future.  As a result of an ultimately unsuccessful lawsuit by Tinley Park residents opposing the zoning changes and variances, which delayed the project and resulted in the expiration of the developer's funding for the project, the Ryan Companies withdrew its plans to build the Thomas Place development in Tinley Park.

49.     In 2015, PIRHL, an affordable housing developer, applied to the Illinois Housing Development Authority ("IHDA") for a Low-Income Housing Tax Credit allocation for a proposed age-restricted affordable housing complex for senior citizens that would have been located in the Legacy Code Area in Tinley Park.  As housing for seniors, the PIRHL project likely would have been occupied by a greater percentage of whites, like Brementowne Manor, than affordable family housing like The Reserve.  Then-Mayor Zabrocki provided a letter of support to IHDA for PIRHL's application, although a similar request by Buckeye for a letter of support was denied by Mayor Seaman when he was serving as acting mayor.  PIRHL was not awarded the tax credits and abandoned its plan to build the complex before it could submit a full application to be considered by the Plan Commission.

50.     In the surrounding market area, there is only one other affordable housing complex that is not age-restricted. That complex—Pheasant Ridge—is a project-based Section 8 complex located in neighboring Orland Hills that is fully occupied and has approximately 200 households on the waiting list.

51.     Most market-rate apartment complexes in Tinley Park and the market area have only one and two bedroom units and are not affordable to low income households.

52.     In 2015, IHDA found that Tinley Park was at risk of being subject to the Affordable Housing Planning and Appeals Act ("AHPAA"). Municipalities are at-risk of being subject to AHPAA when only 10-20 percent of housing in the municipality is affordable to homebuyers at 80 percent of the regional median household income or renters at 60 percent of the regional median household income. IHDA determined that only 19.4 percent of Tinley Park housing is affordable by that standard. Of the 135 municipalities in Cook County, only 38 municipalities are either subject to AHPAA or, like Tinley Park, designated as at-risk of being subject to AHPAA.

53.     The need for affordable housing in Tinley Park is disproportionately borne by African Americans. A disproportionate percentage of African Americans in Tinley Park currently rent their homes. In the Village, over 55 percent of African Americans are renters while only approximately 12 percent of whites are renters. Among those renters, a disproportionate percentage of households relying on rent subsidies are African American. There are 43 households in Tinley Park receiving federal Housing Choice Vouchers. African American households are disproportionately represented in this group: African Americans are just 3.6 percent of the Village's population, but they constitute 57 percent of households

receiving Housing Choice Vouchers. In contrast, the Village population is 81.2 percent white, but just 41 percent of the households receiving vouchers are white.

54. A disproportionate percentage of African Americans are eligible for the types of income-limited units proposed for the Reserve. The Reserve would have a certain number of units designated for households with household incomes under 30 percent, 50 percent, and 60 percent of the area median income ("AMI").

55. In Tinley Park, over 22 percent of African-American households have a household income under 30 percent of AMI; over 34 percent of African-American households have a household income under 50 percent of AMI; and over 46 percent of African-American households have a household income under 60 percent of AMI.

56. By comparison, in Tinley Park, just 11 percent of white households have a household income under 30 percent of AMI; approximately 21 percent of white households have a household income under 50 percent of AMI; and under 26 percent of white households have a household income under 60 percent of AMI.

57. A disproportionate percentage of families with children are eligible for affordable housing. In the market area, 71 percent of households in poverty (approximately 50 percent of AMI) have children. On the other hand, only 44 percent of households above the poverty line have children.

### Buckeye's Proposal for The Reserve

*Overview of The Reserve*

58. The Reserve, if built, will be a three-story, 47-unit rental apartment building that will be occupied by low, very low, and extremely low income households, as those categories are defined by the U.S. Department of Housing and Urban Development. Buckeye plans to

construct The Reserve on the currently vacant lot at the northeast corner of the intersection of 183rd Street and Oak Park Avenue in Tinley Park, for which it has a pending agreement to purchase that expires on June 1, 2016.

59.    The Reserve will include 10 one bedroom, one bathroom units of 800 square feet each.  One of the units will be for extremely low-income tenants (households making at or below 30 percent AMI), six of the units will be for very low-income tenants (50 percent AMI), and three of the units will be for low-income tenants (60 percent AMI).

60.    The Reserve will include 10 two bedroom, two bathroom units of 1,000 square feet each.  One of the units will be for extremely low-income tenants, four of the units will be for very low-income tenants, and five of the units will be for low-income tenants.

61.    The Reserve will include 27 three bedroom, two bathroom units of 1,200 square feet each.  Five of the units will be for extremely low-income tenants, twelve of the units will be for very low-income tenants, nine of the units will be for low-income tenants, and one will be a market-rate unit.

62.    Seventeen of The Reserve's 47 units will be covered by project-based vouchers, under which tenants pay 30 percent of their income in rent and the voucher covers the remainder of the monthly rent.  The voucher households for The Reserve will be selected from the Chicago Regional Housing Initiative ("RHI") waiting list.  Approximately 61 percent of the RHI waitlist applicants are African-American.

63.    The complex will offer interior hallways, an elevator, an on-site management office, parking, and various community amenities including a laundry facility, computer and fitness rooms, and play areas for children.  A site and market study, which was prepared in July

2015, concluded that demand for units at The Reserve would be high given the property's desirable location and scarcity of affordable apartments in Tinley Park and the market area.

64.     The market study found that the units at The Reserve "are very well sized and will be comparable to or larger than most of the market rate apartments" in the area, and that the quality of the building, the apartment units, and the common amenities would exceed those offered at Pheasant Ridge, the only other affordable housing complex in the area, and be comparable to market-rate complexes in the area.

65.     The market study noted that the site "will be very marketable" because its corner location "will be highly visible to potential residents" and because "[t]here is just one other affordable property in the Market Area, and The Reserve would provide another welcome option."

66.     The market study concluded that the development of The Reserve "will fit into the fabric of the community and have a positive impact on its well-being."

***Routine Planning and Approval Process***

67.     After locating the vacant, available site at the corner of 183rd Street and Oak Park Avenue in late 2014, Buckeye contacted Ivan Baker, the Village of Tinley Park's Director of Economic Development, in February 2015 to notify the Village of Buckeye's interest in initiating a development at that site.

68.     In an email dated March 19, 2015, Baker instructed Buckeye to contact Amy Connolly, the Village's Planning Director, to provide her with more information about the project and to get answers regarding any questions about the planning process and zoning requirements.  Buckeye initiated contact with the Planning Department.  Following these initial communications, Buckeye proceeded to acquire the rights to the parcel.

18

69.     Consistent with the Legacy Code's requirement that applicants meet with Village staff prior to the official submission of any application for development in the Legacy Code Area, Buckeye met with Village staff on several occasions before it submitted the formal application for The Reserve. On March 20, 2015, Buckeye's representatives met with Baker and Connolly to discuss the proposed development. On March 23, 2015, Buckeye's architect, engineer, developer, and contractor had a second pre-application meeting with the Village's Planning Director, Village Engineer, Building Commissioner, and Fire Department staff. The same group continued discussions in subsequent meetings on April 13, 2015, and May 21, 2015.

70.     On March 27, 2015, Buckeye and the owner of the parcel at 183rd Street and Oak Park Avenue entered into a Purchase Offer and Agreement, memorializing the purchase price of $600,000 and agreed-upon terms. The Agreement is contingent on Buckeye securing all necessary approvals for The Reserve project. Under the Agreement, Buckeye made a $5,000 earnest money deposit that would be refundable if contingencies were not met. The Agreement provided for a due diligence period until October 31, 2015, with an extension to March 31, 2016 upon the payment of an additional earnest money deposit of $15,000, at which point the full $20,000 earnest deposit would become non-refundable but applicable at closing. The closing date set by the Agreement was March 31, 2016. Buckeye was permitted to extend the closing date and life of the Agreement until June 1, 2016 with an additional deposit of $10,000. Under the Agreement, Buckeye also agreed to pay, at closing, an annualized simple interest rate of 3.5 percent of the total purchase price running from November 1, 2015, until the date of closing, as well as all property taxes on the property running from November 1, 2015, through closing. Under these terms, a delayed closing results in a higher payment of interest and taxes at closing. The Agreement may not be extended past June 1, 2016.

19

71.     On April 17, 2015, Buckeye submitted conceptual drawings of The Reserve to the Planning Department for initial review and feedback.

72.     On May 12, 2015, a Buckeye representative met at Village Hall with Planning Director Connolly, then-Mayor Edward Zabrocki, then-Trustee David Seaman, and the Village Manager.  None of the Village officials at the meeting expressed concern about or opposition to The Reserve.

73.     Buckeye sought and obtained an allocation of federal Low-Income Housing Tax Credits to finance the construction of The Reserve, and has sought other funds for the development of affordable housing.  The Low-Income Housing Tax Credit program was created by the United States Congress in 1986 to promote the development of affordable housing for low income individuals and families.

74.     In Illinois, the Low-Income Housing Tax Credit program is administered by IHDA.  IHDA issues a Qualified Allocation Plan ("QAP") describing the criteria it considers in evaluating projects applying for an allocation of tax credits.  Credits are allocated through either the issuance of tax-exempt bonds or through a highly competitive selection process.  In the competitive selection process, IHDA considers a variety of factors, including project location, housing need characteristics, whether the tenant population will include families with children, whether the project would contribute to a community's revitalization plan, and whether the project would affirmatively further fair housing.

75.     IHDA awards extra points in the scoring process for projects located in areas designated as "Opportunity Areas" under the QAP.  IHDA defines Opportunity Areas as places that have low poverty, high access to jobs, and low concentrations of existing affordable rental housing.  The proposed site of The Reserve is located in an "Opportunity Area."

76.     In the summer of 2015, Buckeye submitted an application to IHDA for a Low-Income Housing Tax Credit allocation to fund The Reserve project through the competitive selection process.

77.     IHDA allocated Buckeye the Low-Income Housing Tax Credit for the project in September 2015, after which Buckeye notified the Planning Director that it had received the award.  The Planning Director then notified the Village administration about the award.

78.     Between the spring and fall of 2015, Buckeye and the Village Planning Department staff were in regular contact to discuss various components of the pre-application planning process, including Buckeye's application to obtain Low-Income Housing Tax Credit funding from IHDA, conducting outreach to potential tenants, addressing site issues and Planning Department questions and concerns, and various other routine communications that were consistent with the Legacy Code's requirement that developers strictly conform their projects to the code, as administered by Village planning staff.

79.     On October 25, 2015, Buckeye submitted its application materials to the Planning Department, which initiated a review of the application for completeness.  During this review, Planning Department staff identified additional information that Buckeye needed to submit to finalize its application.

80.     Between October and December 2015, Buckeye supplemented its application materials and remained in contact with Planning Department staff about the timing of the application review and approval process.  On a number of occasions during the planning process, Buckeye modified its plans and design to conform to Legacy Code requirements and other requests articulated by the Village planning staff.

81.     On November 25, 2015, the Planning Department sent a preliminary staff review letter to Buckeye describing outstanding issues that needed to be addressed before the formal submission.

82.     On December 11, 2015, Buckeye submitted its full application to the Village, including revised architectural drawings, engineering plans, site plans, and other documents required by the Legacy Code.  Buckeye also submitted responses to the Village staff's comments contained in the November 25, 2015 review letter.

83.     On December 17, 2015, Buckeye had a meeting at Village Hall with Village Staff, including Planning Department staff, the Village Engineer, the Village Fire Department staff, and the Village Building Commissioner to discuss the masonry plans for the building.

84.     Between late December 2015 and early January 2016, Buckeye worked with Village staff to refine the project's architectural, site planning, engineering, and landscape plans to conform to the Legacy Code requirements.

85.     On January 12, 2016, the Planning Department issued a final staff report on The Reserve, in which it concluded that The Reserve was in precise conformance with the Legacy Code and recommended that the Plan Commission approve the project.

86.     On January 20, 2016, Planning Director Connolly presented information on the project to the Tinley Park Main Street Commission.  At that meeting, several members of that commission asked questions about whether the complex would include rentals and about the types of potential tenants the complex would attract.

87.     At the January 21, 2016 Plan Commission meeting, Planning Director Connolly formally presented the project to the Plan Commission for the first time.  In her presentation, Connolly noted on the record that federal law prohibited consideration of the project's status as

an affordable housing project or the potential demographics of occupants, and advised the Commission that it was restricted to considering conceptual engineering, architecture, landscape architecture, and the site plan in making its determination of whether to approve the project. Several commissioners expressed praise for the project and the Plan Commission chair said in the meeting that she was delighted to have The Reserve in the Legacy District and welcomed Buckeye to the Village. At least one Village Board of Trustees member was in attendance at that meeting.

88. At the January 21, 2016 meeting, Planning Director Connolly informed the Board that she would schedule a vote for The Reserve for the next meeting, February 4, 2016, because of outstanding items concerning Buckeye's application, including submission of a final landscape plan and finalization of the engineering review in anticipation of the building permit process.

89. Buckeye submitted additional information addressing all of the outstanding items prior to the February 4, 2016 Plan Commission meeting. The Planning Department, in an updated staff report to the Plan Commission dated February 4, 2016, noted Buckeye's compliance with those items and full conformance to the Legacy Code.

*Race-Based Opposition to The Reserve*

90. The day after the January 21, 2016 Plan Commission meeting, a local newspaper, the *Daily Southtown*, published an article about The Reserve with the headline, "Affordable Housing Complex Planned for Tinley Park."

91. Almost immediately after the *Daily Southtown* article was published, community members initiated a campaign to oppose and stop the project. The opposition to the development

by the overwhelmingly white residents of Tinley Park as well as Village officials has been hostile, well organized, and has continued unabated since late January 2016.

92.    Many community members expressed opposition to The Reserve using racially charged language and employing insidious racial stereotypes and code words about the types of tenants who would live in affordable housing.  These included references to public and affordable housing in predominantly minority communities, fears of increases in crime, concerns about declining property values, and fears that academically underperforming children would enter Tinley Park's public schools.  The opposition mirrored the language used during the Village's resistance to integration four and five decades earlier.

93.    Opponents of The Reserve created a group called the "Citizens of Tinley Park," which has a website and a public Facebook group with over 5,000 members that has been used as a forum for residents to express opposition to the project and to mobilize members to attend public meetings, protests, and participate in other opposition efforts.  The group also maintains a separate public website, which sells merchandise, including yard signs, stickers, and buttons, including one with the logo of the Buckeye Community Hope Foundation surrounded by the red universal "no" symbol with a circle and backslash, accompanied by the words, "Tinley Park Has Spoken."  Banners with that graphic have been used at protests throughout Tinley Park.  At least one Village official, Defendant Trustee Brian Younker, is a member of the Citizens of Tinley Park Facebook group.

94.    Major opposition to The Reserve has also appeared on a second Facebook group, "Concerned Citizens for Tinley Park," which is run and moderated by Defendant Trustees Pannitto, Vandenberg, and Younker.  The Facebook group is associated with and links to the

24

website for those Trustees' 2015 political campaign for the Board of Trustees,
www.concernedcitizensfortinley.com.

95.     Numerous comments on the Citizens of Tinley Park Facebook page contained
racially discriminatory language.  One of the group's leaders, Michael Fitzgerald, repeatedly
warned members not to post racist comments about The Reserve and that such comments would
be deleted, based on his concern that such comments could be used as evidence of discrimination
in potential litigation.  Fitzgerald has since been appointed to the Village's Board of Zoning
Appeals on the recommendation of Mayor David Seaman and a vote of the Board of Trustees.

96.     On January 24, 2016, Fitzgerald posted an article to the Citizens of Tinley Park
Facebook page entitled, "HUD's 'Disparate Impact' War on Suburban America," which
criticized HUD's enforcement of the Fair Housing Act, with the comment, "Everyone should
read this.  It will help you understand the outdated legislation and how development was put in
motion right under our noses."[1]  In a later comment to that post, Fitzgerald added, "Seriously, it's
not like we don't work hard and pay a lot to live here. I am sick and tired of this 'life has to be
fair' bullshit. It makes me sick to my stomach that people will be allowed, with government
assistance, to be able to live in the same place, with the same opportunities that we have all
worked hard for just because it isn't fair. Life isn't always fair people, in fact sometimes it sucks-
deal with it and live somewhere you can actually afford."

97.     The next day, on January 25, 2016, Fitzgerald wrote a post about a lengthy
conversation he had that day with Defendant Trustee Vandenberg about The Reserve.  In that
post, Fitzgerald acknowledged the possibility of litigation if the Village rejected Buckeye's

---

[1] All online comments quoted in this Complaint appear in their original form with no corrections
applied for spelling or grammatical errors.

proposal, writing, "Agree, but they really can't stop it- the village would be sued by the federal government. . . ." On January 26, 2016, Fitzgerald noted the "infighting, racial slurs, and negativity" in the comments. On February 6, Fitzgerald instructed commenters not to use racist language, indicating that the group moderators were monitoring and removing such comments from public view, and asking members to report racist and sexist language to the moderators since "we cannot police the whole site." In a subsequent comment in that thread, he wrote, "That's why we have to watch our backs and just be nice. If we are nice, then people who try to make us look bad have no ammo." Before the Board of Trustees meeting on February 16, 2016, Fitzgerald once again warned the Facebook group members to avoid comments about race at the meeting, writing, "Don't let Buckeye be successful in making us look bad."

98.    Numerous comments referencing race-based opposition to The Reserve were deleted from the public Facebook page based on the group leaders' concern that these comments would constitute evidence in a discrimination lawsuit. For example, on February 1, 2016, in reference to the proposed site of The Reserve, several commenters discussed a property nearby occupied by a bar named Dendrino's. In that comment thread, one resident posted, "Need to 'pour a 40' for Jerry Dendrino RIP ;-(," referring to the recently deceased owner of the bar, with an image of an African-American man pouring beer on the ground at a cemetery. Another resident, referring to the man in that image, responded, "Is that one of the hopeful occupants?" The entire thread containing those comments was later deleted from the Facebook group.

99.    Other community members echoed Fitzgerald's call for members to avoid public statements containing discriminatory language. On February 14, 2016, in a discussion of a potential lawsuit against the Village, one community member wrote, "So, are you saying that Buckeye should sue TP for trying to stop the low income housing because they don't want the

kind of riff raft associated with public housing projects?" In the very next comment, another resident wrote, "Tinley park, as a whole, has to be very careful with every step that's taken. Every iota of information needs to be twisted and seen from both sides of the law. All this could get turned around by buckeye with a lawsuit against the city. Too many people from the start have publicly made comments regarding race and people of lower financial means. All that can be twisted by buckeye too. We have to be very diligent with every move."

100. In addition to the explicit recognition of the race-based opposition to The Reserve, posts on both the Concerned Citizens for Tinley Park Facebook page operated by Trustees Pannitto, Vandenberg, and Younker, and on the Citizens of Tinley Park Facebook page opposing The Reserve, have regularly referenced the view that allowing The Reserve to be built would transform Tinley Park into one of the neighboring predominantly African-American communities:

      a.    "I have gone through a dramatic situation and I am in a hell of a lot of debt but I work my butt off everyday to make sure my family is taken care of. I don't agree with allowing HUD into my neighborhood and yes I have seen first hand on what it DOES do to a community! People just take a really long hard look at Sauk Village! My husband and I work way too hard for the government to just give our money away!"

      b.    The population of Sauk Village, located in Cook County, is approximately 63 percent African American/black and 28 percent white.

      c.    "Why weren't the residents of Tinley Park included or even notified that they were going to put low income housing in the DOWNTOWN AREA! Does Downers Grove or Naperville have low income housing right in the heart of their downtown area??? NO! They put condos by the train stations so that working commuters can

conveniently work and live in those communities. I wouldn't be opposed if a % of the complex was available for low income, but not the ENTIRE complex in a DOWNTOWN AREA! TP citizens, ask our local police station how many police officers we currently have.... It's in the single digits, from what I've been told. Unfortunately, Tinley Park did not do their research to see how similar decisions have impacted other south suburbs - how it severely lowered the housing values with no beneficial tax break for the hard working citizens who do pay taxes and sacrificed to afford living in a community where they could offer their families a better living. My husband and I have worked hard and have sacrificed to afford to live here."

d.      Downers Grove's population is approximately 85 percent white and 3 percent African American/black. Naperville's population is approximately 70 percent white and 5 percent African American/black. Both communities are located in the western suburbs of Chicago in Cook County.

e.      "If they are getting the tax credit from the State, why can't they build this in Robbins, where the city isn't thriving, and it can actually help increase property values instead of Tinley Park and reduce ours?"

f.      The population of Robbins, Illinois, located in Cook County, is approximately 96 percent African American/black and 34 percent white.

g.      "Why not build it on 191st and Harlem. Oh yeh because it wouldn't fit in with Brookside Glen. The future of Tinley is looking more and more like Harvey."

h.      The population of Harvey, Illinois, located in Cook County, is approximately 76 percent African American/black and 3 percent white.

i.     "I'll bet my life savings that this place is overrun by garbage within a year or two," to which another resident responded, "Village of Tinley Park rolling out the Matteson plan I see."

j.     The population of Matteson, Illinois, which is located in Cook and Will counties, is approximately 81 percent African American/black and 15 percent white.

k.     "So the people who don't work at all & work the system will qualify...? How is this not 'section 8'...  It's the same thing except the name 'section 8' doesn't have a good ring to it anymore, pretty soon 'affordable housing' will have the same affect.  I grew up here but will definitely be moving before the value in TP turns to total shit... All the shit from country club hills and matteson will soon be crossing over into Tinley... Peace out!!"

l.     "I will not let them destroy my good, safe neighborhood.  Tinley is an upscale neighborhood that needs more upscale housing not 'affordable low income housing' that's what country club hills is for!"

m.     The population of Country Club Hills, Illinois, located in Cook County, is approximately 87 percent African American/black and 9 percent white.

101.    On March 7, 2016, on the Citizens of Tinley Park Facebook page, a Tinley Park resident posted a comment reminiscent of Tinley Park's history as a destination for whites fleeing increasingly African-American neighborhoods in Chicago, writing, "This is what happened in the 60s in urban Chicago, and why the suburbs were developed so quickly-the crime that permeates the city expanded and inspired a flight just as in Detroit and the Bronx and Oakland…."

102.     Other residents shared their concern about the types of tenants that The Reserve would attract.  "I love how they make it sound like it's going to be housing for veterans, police officers, and teachers.  They sure do know how to blow smoke up our ass," commented one resident on the Concerned Citizens for Tinley Park Facebook page on January 25, 2016.  Another commenter on the site wrote on that day, "Whitey doesn't have a chance."

103.     On January 26, 2016, Citizens of Tinley Park member Michael Fitzgerald wrote on the group's Facebook page, "I want people to start thinking about how we can turn the 'worst case scenario' into something that can be an excellent way to not only help people, but turn this development into something we can be proud of…*We can figure out how to control who lives there.*.  We get a group of volunteers to work on a proposal to make this building for veterans, disabled veterans, and the elderly who need a good place to live.  We actually contact the VA and the VFW look for *worthy tenants*."  (emphasis added).  Another community member wrote, "Well im sure the people who bought the property do not live in tinley park and im sure if we ask them they wouldnt want 'affordable living aka riff raff' being built where they are living and raising their families just so wrong."  Another wrote, "We have all busted our butts to get what we have with no hand outs.  I'm sorry for their misfortunates and I'm glad there are programs put in place to help them but low income housing is not the answer.  The people who have lower incomes *do not deserve to live in our community*."  (emphasis added).

104.     In February, a resident who signed a Change.org petition opposing The Reserve wrote, "The degenerate developer, Bukeye Hope, needs to find another town to install it's pop up ghetto in."

105.     On February 1, 2016, one resident wrote on the Concerned Citizens for Tinley Park Facebook page, "We already have a tremendous amount of section eight housing for those

30

unable to support themselves. Did not the city of Chicago as well as many others clearly demonstrate stacking up poor people is not a viable solution but ferments negativity and crime. Why have all the projects been torn down if the social experiment was such a success? I suspect the minions may not suffer as much but I fully expect Dave Seaman to be a one term mayor."

***Opposition to Families with Children who Would Live at the Reserve***

106.    Many Tinley Park residents also publicly opposed The Reserve because it would attract families with children, in part because of the many affordable three bedroom apartments that the development would include.

107.    On January 24, 2016, referring to Community Consolidated School District 146, which serves children in Tinley Park and neighboring municipalities, a resident wrote on the Citizens of Tinley Park Facebook page, "It will effect our school system, 146 is at what % low income now, what will this building make it. Housing values will plummet because school test scores will plummet. Taxes will skyrocket for paying homeowners and this building has Grant's and Tifs because accepting low income... it is not fair to us hard working paying middle class. I guess America's best place to raise a family was a jinx...."

108.    On January 25, 2016, on the Citizens of Tinley Park Facebook page, several community members expressed their opposition to low-income housing in Tinley Park. In response, others expressed their preference for senior housing or housing that would exclude families with children. One commenter wrote, "If they have to stick with the low income.. then make it low income Veterans only 55 and older!," to which another responded, "22 and older would suffice." Another resident wrote, "The vet thing sounds great on paper and lord knows they deserve any ounce of help any of us can offer but it won't stick…Can't offer it to one batch and not another. the only answer is no subsidies and no qualifications other than can afford rent.

31

Unfortunately they won't/can't build this type of property." Yet another wrote, "Have to be over 55 to apply."

109. On February 2, 2016, referencing the fact that The Reserve would offer a number of three bedroom units, a commenter on the Citizens of Tinley Park Facebook page wrote, "I think the fact that these are mostly 3 bedroom units is a huge negative. Are there rules as to how many people can live in one? Do they have to be related? This could cause a great deal of expense for School District 146. If this development can't be stopped how about negotiating for 1 and 2 bedroom units?" In response to that comment, another resident posted, "Exactly! That's what bothers me the most! If it was senior living, I'd feel better, but 3 bedrooms….puleeeez!"

110. Also on February 2, 2016, a commenter on the Citizens of Tinley Park Facebook page wrote, "We pay a lot in taxes, and the potential stress on education dollars, that are already reduced, is a concern. For example purposes alone, if it costs $10 to educate a child, and there are 3 in the family, yet their tax contribution, if not exempt for being low income already, is less than $30…the downward spiral begins. You cant sustain or progress at a deficit. Senior citizens should be a priority, in my opinion."

111. On February 25, 2016, a resident posted on the Citizens of Tinley Park Facebook page: "I wonder if this thing goes even further than we think they keep closing schools in Chicago they prob want to ship all the kids over here."

***Village Officials Capitulate to and Adopt Discriminatory Opposition to The Reserve***

112. As the community opposition to The Reserve began to mushroom in late January and early February 2016, various Tinley Park officials began to support and endorse the views of the Tinley Park residents who oppose development of The Reserve.

113.    On January 25, 2016, Michael Fitzgerald, one of the vocal Citizens of Tinley Park members opposing The Reserve, posted the following on the group's Facebook page about a telephone call he had with Trustee Vandenberg about The Reserve project.  According to Fitzgerald's post, Trustee Vandenberg recommended "community backlash" as a response to The Reserve, and based on that recommendation, Fitzgerald encouraged "75% of the people on this forum to show up in front of the board and speak up" against the project.

February 2, 2016 Village Board of Trustees Meeting

114.    Mobilized by the organizing efforts of the Citizens of Tinley Park opposition group and others, hundreds of community members opposing The Reserve attended the February 2, 2016 Village Board of Trustees meeting.  Many residents could not fit into the meeting room and stood in the hallway and overflow areas.

115.    At the February 2, 2016 Village Board meeting, both Trustee Vandenberg and Mayor Seaman expressed concerns about The Reserve for the first time.  At the outset of the meeting, Trustee Vandenberg addressed the room, calling for a moratorium to stop The Reserve and any other development under the Legacy Code until the code could be revised to make approval of The Reserve more difficult, if not impossible.  He also stated, "I don't believe there is a need for a large influx of affordable housing in our community."

116.    Following Trustee Vandenberg's remarks, Mayor Seaman addressed the large audience, telling them, "[E]verybody on this Board is concerned about your concerns because your concerns are our concerns.  We all live in Tinley Park.  We all have substantial investments here be it in our homes, be it in the families that we've raised, be it in the businesses that we run or are a part of.  So your reservations are our reservations.  Your concerns are our concerns."

117.    A number of members of the public spoke, articulating many of the same stereotypes, fears, and concerns previously made on the various Facebook groups. One asked Buckeye's representative, "Why do we need free and reduced lunch kids, Mr. Developer?" Other audience members expressed similar concerns about families with children who may attend Tinley Park schools. One audience member stated, "At the risk of sounding politically incorrect, I do not want low-income housing two and a half, three blocks from my house. I'm sorry."

118.    During the meeting, when an audience member asked the Trustees to indicate how they would vote on the project if given the opportunity, Trustee Brady declined to give an answer and Trustee Maher said he would vote yes "because I do not want to invite a lawsuit for discrimination by this Village Board."

119.    At the end of the meeting, Trustee Vandenberg, the Trustee liaison to the Plan Commission, stated his intent to ask the Plan Commission to "table" the scheduled vote on The Reserve plan.

February 4, 2016 Plan Commission Meeting

120.    In advance of the February 4, 2016 Plan Commission meeting, the Planning Department provided an updated staff report on The Reserve. The updated report contained a table identifying the five items identified as outstanding at the January 21, 2016 Plan Commission meeting and noting that each of those issues had been addressed in compliance with the Legacy Code's requirements.

121.    At the February 4, 2016 Plan Commission meeting where The Reserve was on the agenda for approval, hundreds of community members attended the meeting and voiced major opposition to the project at the tacit invitation of the Mayor and Trustee Vandenberg. Most of

the public attendees were unable to fit into the meeting room. A determination letter issued by the Illinois Attorney General, dated April 4, 2016, noted that as many as 1,000 community members attended the February 4 meeting and that the Commission violated the Illinois Open Meetings Act by not providing a larger space for the anticipated crowd.

122.    When the agenda item for a vote on site plan approval for The Reserve was announced, both Mayor Seaman (who does not sit on the Plan Commission) and Trustee Vandenberg (who is the Board of Trustees liaison to the Commission but is not a Commission member) addressed the Commission and audience before any action could be taken. The Mayor informed the audience that he was calling on the Village Board of Trustees to retain a special counsel to review the Legacy Code and that he would appoint a group of four citizens to work with the Plan Commission and Planning Department in that review process. Trustee Vandenberg then asked the Plan Commission to table a vote on The Reserve and informed the Commission that he had asked the Board of Trustees to institute a moratorium on development under the Legacy Code. Shortly thereafter, the Mayor quickly selected four vocal individuals in the room as the four-person citizen's committee, and told them they would be working with Trustee Vandenberg, the Planning Staff, and the Board of Trustees' Planning and Zoning Committee on revisiting the Legacy Code. Community members who were unable to enter the meeting room expressed concern in their public comments about not being considered for the committee since they were in the overflow area.

123.    Immediately following Trustee Vandenberg's remarks, Plan Commissioner McClellan moved to refer The Reserve proposal back to staff for further review, citing the public statements by the Mayor and Board of Trustees members. Commissioner McClellan stated, "In light of what was stated by several trustees and the Mayor at the Village Board meeting of

February 2, 2016, I do not feel we are in a position to vote for site approval at this time." The Commission approved the motion to refer the project back to Village staff.

124.     The Plan Commission gave no indication to the Planning Department staff as to what further review was needed. The Planning Department had completed its review and the Plan Commission identified no specific issues with The Reserve that needed to be addressed, as the outstanding issues related to the project's engineering plan had been resolved.

125.     At no point, either during or before the February 4, 2016 meeting, did the Plan Commission or any of its members question or dispute the Planning Department's determination that The Reserve site plan was in precise conformance with the Legacy Code.

126.     The call for a special counsel to review an existing code before a project designed to conform to that code and recommended for approval by Planning Department staff receives a vote by the Plan Commission, is an unprecedented departure from Tinley Park's normal procedures. Additionally, the Mayor's impromptu and ad hoc appointment of a citizen committee to participate in the code review and revision process was also unprecedented and has no support in either the Village code or the Village's regular practices. The referral of a project proposal already fully reviewed by the Planning Department and already found to be in precise compliance with the Code back to Village staff for further review, without direction, is also unprecedented and a departure from the normal approval processes set forth in Village code. Furthermore, a delay or tabling of a vote on a project because of the Village Board's desire for its own separate, additional review, is inconsistent with the streamlined approval process under the Legacy Code, which does not grant the Board any role in approving code-compliant projects.

127.    The requests by the Mayor and members of the Board of Trustees that the Plan
Commission delay or table their vote on The Reserve constituted impermissible interference with
the normal processes and procedures in place in the Village and required by Village code.

128.    Following the Plan Commission's decision to refer The Reserve project back to
the Planning Department staff, many residents made remarks opposing The Reserve based on
their opposition to and fear of affordable housing, families with children moving into the
community, and Tinley Park becoming like predominantly minority communities in the area.

129.    At the February 4, 2016 Plan Commission meeting, one resident commented, "I
don't know who's making money on this.  But the need for low-income housing [is] not
necessary and it doesn't contribute anything positive… We don't need more families draining
the economy, especially who aren't able to contribute."

130.    Also at the February 4 meeting, two Tinley Park real estate agents voiced
opposition for The Reserve based on fears of increased crime and decreased property values.
One realtor stated, "I'm here to let you know that low-income housing, when you concentrate
low-income families in a single area you're not providing the best quality of life for them.
You're actually creating a detriment to their survival.  Even though it's been reported that, oh,
we're going to screen them and so on and so forth, I disagree.  I would be very willing to do
research to support what I'm telling you and provide you with details and information.  I also
have experience as a realtor.  I do believe that it would increase the crime rate.  There are
examples nearby Tinley Park where that is true in low-income housing.  It will also affect the
property values in the surrounding area.  And it will affect the crime rate in the entire town."
The other realtor offered similar sentiments, stating, "Friday, [a] buyer decided that they were
going to take away their offer, because they heard about the low-income housing.  So the longer

37

that this property is going to stay on the market, the more that people are fearful of buying it. So the lower it's going to go. And then everybody's comparables, all the comps when they're trying to sell their homes, are going to go lower. And the value of our homes are going to go lower as well."

131.     At that same meeting, a retired police offer who lives in Tinley Park similarly cited the fear of increased crime, stating, "I moved from the City of Chicago. I'm a retired policeman for 25 years. And you don't want low-income housing in this area. It brings nothing but trouble. You're going to have nothing but problems. The police department is going to have nothing but calls. It's not a good thing. It's not a good thing. I've worked in the Ickies. I've worked in the Dearborn Gardens. I've worked Alba Homes. You don't want, you don't want any kind of low-income housing. You guys are going to regret it."

132.     The Harold L. Ickes Homes and ABLA Homes were large-scale Chicago Housing Authority public housing projects in Chicago, which were occupied almost exclusively by African Americans before being demolished in recent years. Dearborn Homes is a large-scale Chicago Housing Authority public housing development with a predominantly African-American population.

133.     Another resident commented at the February 4 meeting, "I have fear for my granddaughter. My granddaughter goes to Central Middle School. And I fear for the close proximity of this to Central Middle School. They say they're going to vet everyone that they rent to. Are they going to vet all of their friends that come? The City of Chicago I'm sure vetted the Robert Taylor Homes. Look what happened with Robert Taylor Homes."

134.     Robert Taylor Homes was another large-scale, high-rise Chicago Housing Authority public housing project on Chicago's South Side. The project's 28 high-rise buildings

38

contained 4,415 units. At one time, the Robert Taylor Homes housed an estimated 11,000 residents, of whom approximately 99 percent were African-American.

135. Another member of the public expressed similar comparisons to predominantly African-American communities at the February 4 meeting, stating, "My opinion on the matter, which I'm here to give, is that I believe that with public housing, since I've grown in Calumet City and seen that town get public housing, that, like the lady prior to me has said, the crime rate goes up. Now I have a six-week -- year old infant. Now the last thing I want to do is to have to guard my house 24 seven because of low-income housing. In Chicago they had 51 murders there last month. I can guarantee you it wasn't from middle-class neighborhoods or up in the Grayslake area. So that's my concern. Safety. And as a governing body, I believe that's our first priority is to take care of the people. Protect the people. Now bringing in public housing, does that benefit the people? Does that make them safe? I think not. Is that going to make my child safe, my wife safe? I think not. So in my opinion, the whole thing has got to be shelved -- not shelved, gotten rid of. I don't care how much money he's given from the federal government, 1.2 million. Is that the price we put on my family's lives or whatever?"

136. The population of Calumet City, Illinois, located in Cook County, is approximately 70 percent African American/black and 13 percent white. By contrast, the population of Grayslake, Illinois, in Lake County, is approximately 76 percent white and 3 percent African American/black.

**Subsequent Events**

137. On February 11, 2016, Buckeye sent a letter to the Mayor, Plan Commission Chairperson, and Village Manager noting that the Planning Department staff "determined that our proposed development satisfies all applicable site plan, massing, and architectural

39

requirements set forth in the Legacy Code, and that our proposed development requires no variances or special approvals," that the Plan Commission noted five open items concerning the development at its January 21, 2016 meeting, and that all five items were addressed to the Planning Departments' satisfaction before the February 4, 2016 Plan Commission meeting. Buckeye further wrote that "we are lawfully entitled to a final decision concerning our proposed development under the existing Code," requested that the application be returned to the Commission for a vote, and that a final decision on the application be made by the Commission by February 18, 2016. The Village did not respond to this letter.

138. At the February 16, 2016 Board of Trustees meeting, Mayor Seaman incorrectly stated that "there's some other work that's being reviewed on that particular development," and that "I don't see it coming up quickly for a vote at least at this point in time until some of these issues are resolved."

139. On February 23, 2016, Buckeye's counsel sent a letter to the Village attorney again stating that Buckeye had met all application and approval requirements, and again requesting a vote on the proposal. Buckeye received no response.

140. During the March 1, 2016 Village Board of Trustees meeting, a member of the public interrupted the Village Clerk's remarks, shouting, "Tinley Park has 20 percent minority! Orland Park has 6! Why don't you build it over there? Build it in your backyard! I don't want it [inaudible] I don't want [inaudible] built in Tinley." The man's remarks were accompanied by loud applause from the audience. None of the Village officials or Board of Trustees members at the meeting responded or told the man that his comments were inappropriate. Two minutes later, while Mayor Seaman was speaking, the man continued shouting similar comments, including, "We don't want it in the south end of Tinley. Simple. Build it somewhere else. . . . I don't need

40

it. We've already got 20 percent." The Mayor responded, "Okay, your message has been taken and I'm sure the developer has heard it as well." After a board member called for the man to be removed, the Mayor told the man, "If you want to persist, it may be time for you to leave. You've made your point sir. Thank you." Village Attorney Thomas Melody then said, "Get him a t-shirt." The man then returned to his seat and was not removed from the meeting.

141.    The population of Orland Park, Illinois, which is located in Cook County and borders Tinley Park, is approximately 90 percent white and 3 percent African American/black.

142.    On March 17, 2016, Buckeye's counsel again wrote to the Village attorney demanding a vote on The Reserve at the scheduled Plan Commission meeting on April 7, 2016.

143.    On March 24, 2016, the Village attorney responded to Buckeye's counsel, advising Buckeye that, due to resignations, no Plan Commission would be in place until sometime in April, that the Cook County Sheriff's Office was conducting a review of The Reserve's approval process, that the Planning Department staff's finding that the project was in "precise conformance" with the Legacy Code was not binding, and that no vote on the project was anticipated on April 7.

144.    On March 25, 2016, the Village cancelled the April 7, 2016 Plan Commission meeting.

145.    The public and Village officials' opposition to The Reserve has continued. Opponents of The Reserve began picketing at the proposed site of the development in mid-February 2016.

146.    On February 27, 2016, Defendant Mayor Seaman brought picketers at The Reserve site coffee and donuts. The Mayor spoke with protesters, many of whom are members of the Citizens of Tinley Park group. According to one member's post on the group's Facebook

41

page later that day, Mayor Seaman "thanked us for our dedication and in no uncertain terms communicated he is with us in the Battle Against Buckeye. He said we were saying and doing things he cannot." Another member posted a photo of Mayor Seaman standing next to a protester on the group's Facebook page.

147. In the face of the widespread public opposition to The Reserve, numerous Tinley Park officials have resigned or been removed from their positions.

148. Shortly after the February 4, 2016 Plan Commission meeting, seven of the nine Plan Commission members abruptly resigned from the Commission. Consequently, the Plan Commission lacked a quorum and the Village cancelled all scheduled Plan Commission meetings between February 18, 2016, and April 7, 2016.

149. On February 16, 2016, the Village placed Planning Director Amy Connolly on indefinite leave with pay pending an investigation into the approval process. At the time of this complaint, Ms. Connolly was still on leave.

150. At the March 8, 2016 meeting of the Village's Committee of the Whole, Assistant Village Manager Mike Mertens explained the proper procedures for project approval under the Legacy Code. He explained that the Legacy Code Area was intended from the beginning to transition from predominantly residential in the outer areas to predominantly commercial in the downtown core. He also explained that "if you meet the code and you need site plan approval, you only need Plan Commission approval, not Village Board approval." He further explained that the Legacy Plan and Legacy Code were developed after a year of public meetings, input from the Plan Commission, Main Street Commission, and Economic Development Commission, as well as the Board of Trustees.

151. On March 22, 2016, the Village Board of Trustees voted to allow the Village to request a review by the Inspector General of the Cook County Sheriff's Office into the Planning Department's review and approval of The Reserve proposal. That Inspector General's review was ongoing at the time of this Complaint.

152. Mr. Mertens tendered his resignation from his position as Assistant Village Manager from the Village on March 28, 2016.

153. At a Village Board of Trustees Committee of the Whole meeting on March 8, 2016, Trustee Maher explicitly acknowledged that the opposition to The Reserve is based on the fact that it is affordable housing. Trustee Maher, serving as Mayor Pro Tem at the meeting, told an audience member that the Village did not send mailers about The Reserve to residents because the project "was deemed to be strict compliance with the code, so there was nothing from the Village to promote." Trustee Maher acknowledged that the project was "not well-publicized," but added, "Neither were some of the other projects that went out that you don't find offensive." Later, Maher stated, "We set the zoning codes. We're responsible for that. But when someone brings in a project that is in strict compliance with those codes, then, no, we don't get to tell them you can't build here because you're low-income housing." An audience member responded, "And it's not about the low-income." Maher replied, "I'm sorry, but it is."

154. During the March 8, 2016 meeting an audience member raised a concern about the number of children The Reserve would add to Tinley Park's schools. Trustee T. J. Grady addressed that citizen, stating the number of children was not considered in other projects approved under the Legacy Code and rebuffing the resident's contention that community opposition to The Reserve was based on "transparency," not discrimination. Trustee Grady stated, that "the bottom line is you don't want—they didn't want the Reserve, and it was said

43

right off the bat by [a resident] the first night is because those kids are going to come in our schools and we don't want to pay for free lunches and we don't—so we understand what the reason is you don't want the Reserve. . . . So if you want to compare apples and oranges, don't come in here and talk about things and then try to tell us it's all about transparency. It really is not."

155. On March 30, 2016, Village Trustee Bernard Brady resigned from the Board.

156. On April 5, 2016, the Village Board of Trustees voted to approve Mayor Seaman's recommendations to fill six of the vacant seats on the Plan Commission. The new Plan Commission members are Edward Matushek, Peter Kroner, Ken Shaw, Anthony Janowski, Ronald Bazan, and Kevin Berthold. Ken Shaw and Peter Kroner have been active members of the Citizens of Tinley Park group.

157. Shaw was an administrator of the Citizens of Tinley Park website and Facebook group, and commenters on that group have frequently referred to him to as a leader in the movement against Buckeye and The Reserve. He has been very involved in coordinating members' attendance at the public meetings at which The Reserve was discussed and the picketing at the site of the proposed development. Shaw's comments on the Citizens of Tinley Park Facebook group include writing on January 26, 2016, that the Village should control who gets to live in The Reserve if the project went forward, commenting, "I suggest that we consider action the Village CAN take if they are truly powerless to stop it. For one, they can acknowledge the concerns of so many and commit to preventing the negative impact on the community. If the Trustees believe the residents will be rookie cops, teachers, etc., what will the [Village] DO to ensure it? More so, will they pledge to resign if the people's fears are realized?" On January 27, 2016, indicating that the community's opposition was motivated by the nature of The Reserve

development and not the process leading to its approval, Shaw posted, "The fact is, people ignore, block, or toss out the vast majority of what the Village communicates and are too busy living their lives, working, and paying taxes to attend the routine Board or Commission meetings. That is, until something controversial fires them up."

158.    Following his appointment to the Plan Commission, Shaw posted on the Citizens of Tinley Park Facebook page that he submitted his resume to the Village at the request of Mayor Seaman, writing, "Though I'm very enthusiastic to serve, I did not ask to be considered for appointment to the Plan Commission. After I spoke at the Committee of the Whole meeting on February 9th, prior to the mass resignations, Mayor Seaman left a voicemail requesting my resume."

159.    At the April 5 meeting, the Board of Trustees also approved Mayor Seaman's recommendations to fill vacancies on the Village's Zoning Board of Appeals, which included Michael Fitzgerald, one of the leaders of the Citizens of Tinley Park group vigorously opposing The Reserve.

160.    Given the ongoing public opposition to The Reserve, large crowds have turned out for every Village Board of Trustees meeting since February, compelling the Village to relocate those meetings to a larger venue.

161.    The agenda for the April 21, 2016 Plan Commission meeting, which the Village scheduled as a special joint meeting of the Plan Commission and Zoning Board of Appeals, does not include consideration of The Reserve. The next regularly scheduled meeting of the Plan Commission is on May 5, 2016.

*Imminent Harm to Plaintiffs*

162.    The highly unusual events, including the discipline of the Planning Director, the resignation of most of the Plan Commission members, the Village's extended delay in appointing new members of the Commission, and the Village's decision to initiate an unwarranted investigation into the routine application and approval process in which Buckeye participated in good faith, have put the project in serious jeopardy.

163.    Buckeye requires Plan Commission approval of The Reserve before June 1, 2016, the outside closing date set forth in the Purchase Offer and Agreement with the site's owner.

164.    Buckeye cannot seek or obtain necessary permits until it receives approval from the Plan Commission. It cannot start work on the project until those permits have been obtained.

165.    To comply with the terms of the allocation of the Low-Income Housing Tax Credit it received to finance the construction of The Reserve, Buckeye must complete construction and units must be available for occupancy no later than December 31, 2017. Given the size and scope of the project, construction must begin no later than summer 2016 to meet these deadlines. If Buckeye is unable to meet this deadline, it will lose the financial benefits of the tax credit and will be unable to proceed with the project.

166.    The Village's continuing, unwarranted delays in taking action on The Reserve proposal are inconsistent with the Legacy Code's streamlined approval requirements, constitute impermissible intrusion by the Village Board of Trustees into the approval process, and constitute a constructive denial of Buckeye's application by the Village.

**INJURY TO PLAINTIFFS**

167.     Through their actions described above, Defendants have injured and are continuing to injure Plaintiffs Buckeye Community Hope Foundation and Buckeye Community Sixty Nine, LP.

168.     Defendants' actions, which have impeded the development of The Reserve affordable housing complex in Tinley Park, have the purpose and effect of limiting housing opportunities for racial minorities and families with children.

169.     Defendants' actions would disproportionately deny housing opportunities in Tinley Park to racial minorities and families with children.

170.     Defendants' actions have the purpose and effect of perpetuating racial segregation in housing in Tinley Park.

171.     Defendants' actions constitute unlawful interference with housing opportunities on the basis of race, national origin, and familial status.

172.     The risk of losing housing opportunities due to unlawful discrimination is an irreparable harm.  Buckeye's development of The Reserve would provide desperately needed affordable housing to individuals and families in the Tinley Park area.  If Defendants succeed in preventing Buckeye from completing construction and renting the units at The Reserve by December 31, 2017, Buckeye will lose the financial benefits of the Low-Income Housing Tax Credit that has been allocated by IHDA, without which Buckeye would be unable to make 46 of the planned 47 units at The Reserve available at rents that are affordable to individuals and families with low incomes.

173.     Buckeye entered into an agreement to purchase the property at 183rd Street and Oak Park Avenue with the current owner of the project that requires the purchase to be

completed by June 1, 2016. If Buckeye is unable to secure the necessary approvals from Tinley Park to begin construction of The Reserve before that date, it may no longer have the ability to purchase that property or may be forced to do so on less favorable terms. Defendants' actions are interfering with Buckeye's ability to contract for the purchase of this property.

174.     Buckeye has expended significant financial resources in planning The Reserve project and revising its plans to meet the requirements of the Legacy Code and the requests of the Tinley Park planning staff between March 2015, and February 2016, including, but not limited to, project management expenses and costs incurred in developing and revising the site plan, architectural drawings, engineering plans, and other plans.

175.     Buckeye continues to seek to develop The Reserve at the property at 183rd Street and Oak Park Avenue in Tinley Park. Defendants' actions continue to prevent Buckeye from developing The Reserve or a similar affordable housing development at that site.

176.     Through their actions described above, Defendants have acted negligently, intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair housing and non-discrimination laws.

177.     As a proximate result of the acts and practices described above, Buckeye has suffered, continues to suffer, and will suffer in the future, great and irreparable loss and injury, including, but not limited to, economic losses, a deprivation of Buckeye's right to develop racially integrated affordable housing for individuals and families with children free from discrimination based on race and familial status, frustration of Buckeye's attempts to provide high-quality affordable housing to qualified individuals in the Tinley Park area, and interference with Buckeye's ability to enter into a contract for the purchase of the subject property.

178.     Defendants acted intentionally, maliciously, and with callous disregard for the rights guaranteed by federal, state, and county fair housing laws.

## CAUSES OF ACTION

### First Cause of Action
### Fair Housing Act, 42 U.S.C. § 3604(a)

179.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

180.     Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a).

### Second Cause of Action
### Fair Housing Act, 42 U.S.C. § 3604(b)

181.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

182.     Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(b).

### Third Cause of Action
### Fair Housing Act, 42 U.S.C. § 3604(c)

183.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

184.     Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(c).

### Fourth Cause of Action
### Fair Housing Act, 42 U.S.C. § 3604(f)

185.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

186.    Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(f).

**Fifth Cause of Action**
**Fair Housing Act, 42 U.S.C. § 3617**

187.    Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

188.    Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3617.

**Sixth Cause of Action**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.***
***Against Defendant Village of Tinley Park Only***

189.    Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

190.    Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.*, under which, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

**Seventh Cause of Action**
**Illinois Human Rights Act, 775 Ill. Comp. Stat. Ann. 5/3-102**

191.    Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

192.    Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/3-102.

**Eighth Cause of Action**
**Illinois Human Rights Act, 775 Ill. Comp. Stat. Ann. 5/3-102.1**

193.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

194.     Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/3-102.1.

**Ninth Cause of Action**
**Illinois Human Rights Act, 775 Ill. Comp. Stat. Ann. 5/3-105.1**

195.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

196.     Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/3-105.1.

**Tenth Cause of Action**
**Illinois Civil Rights Act of 2003, 740 Ill. Comp. Stat. Ann. 23/5**
***Against Defendant Village of Tinley Park Only***

197.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

198.     Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the Illinois Civil Rights Act of 2003, 740 Ill. Comp. Stat. Ann. 23/5, under which, "[n]o unit of State, county, or local government in Illinois shall: (1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender; or (2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender."

**Eleventh Cause of Action**
**Tortious Interference with Contract**

199.    Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 178 as fully set forth herein.

200.    Defendants, through their actions and the actions of their agents, tortiously interfered with Plaintiffs' contract to purchase the property at 183rd Street and Oak Park Avenue intended to be the site of The Reserve development.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Buckeye Community Hope Foundation and Buckeye Community Sixty Nine, LP, pray that this Court:

(a)    enter a declaratory judgment that the actions of Defendants complained of herein are in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*; Title VI of the Civil Rights Act of 1964; the Illinois Human Rights Act, 775 Ill. Comp. Stat. Ann. 5/3-101 *et seq.*; and the Illinois Civil Rights Act of 2003, 740 Ill. Comp. Stat. Ann. 23/5;

(b)    issue a permanent injunction restraining Defendants, their agents, employees, representatives, or any other person acting directly or indirectly with them from unlawfully interfering with Plaintiffs' developments, and directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(c)    award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiffs for the loss that has been caused by the conduct of Defendants alleged herein;

(d)    award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and

that would effectively deter Defendants from engaging in similar conduct in the future;

(e)     award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C.

§ 3613(c)(2), 775 Ill. Comp. Stat. Ann. 5/10-102(c)(2), and 740 Ill. Comp. Stat. Ann. 23/5(c);

and

(f)     order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs Buckeye Community Hope Foundation and

Buckeye Community Sixty Nine, LP, demand a trial by jury of all issues in this case.

Dated:  April 19, 2016

Respectfully submitted,

 /s Katherine E. Walz
Katherine E. Walz (IL Bar No. 6238318)
SARGENT SHRIVER NATIONAL
CENTER ON POVERTY LAW
50 E. Washington, Suite 500
Chicago, IL 60602
Phone: (312) 368-2679
Fax:    (312) 263-3846
katewalz@povertylaw.org

John P. Relman*
Reed N. Colfax*
Joseph J. Wardenski*
RELMAN, DANE & COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 728-1888
Fax:    (202) 728-0848
jrelman@relmanlaw.com
rcolfax@relmanlaw.com
jwardenski@relmanlaw.com

*Attorneys for Plaintiffs Buckeye Community
Hope Foundation and Buckeye Community
Sixty Nine, LP*

* *Pro hac vice* admission to be sought

53